THOMAS F. GRAHAM vs. BOSTON AND ALBANY RAILROAD
COMPANY.

Suffolk.    January 19, 1892. — February 25, 1892.

Present: FIELD, C. J., ALLEN, KNOWLTON, MORTON, & LATHROP, JJ.

*Personal Injuries — Railroad — Uncoupling Cars — Employee's Due Care —
Negligence of Engineer — Car Handles — Defective Tank Car — Condition
Precedent.*

A brakeman employed on a freight train, while uncoupling a flat car with an oil
tank on it from a box car, caught his hand and was injured. In an action
against the railroad company to recover for such injuries there was conflicting
evidence as to the rate of speed at which the train was moving. The plaintiff
testified that he had never before seen a car with a space between the tank and
the block designed to keep the tank in place, that he reached over with his
right hand to get the pin, and that he reached back with his left hand to feel
if there was a grab-iron. Finding none, he put his hand over the block to
hold on, when the engineer started the train with a jerk, and the plaintiff's hand
was caught and injured. *Held,* that whether the plaintiff was in the exercise of
due care was a question for the jury. *Held, also,* that the court could not say,
as matter of law, that "there was no legal obligation upon the defendant to fur-
nish handles for the plaintiff to take hold of when engaged in uncoupling the
cars," and that whether the want of a handle rendered this particular car de-
fective was a question of fact for the jury.

A brakeman employed on a freight train, not being able to pull the pin connecting
a flat car with an oil tank on it from a box car, because the pin was held by the
strain of the train, had the engineer start the engine back to relieve the strain.
He then pulled the pin and called, "All right," and the motion was given to the
engineer to pull ahead, which was done, and the oil tank shifted and caught
the brakeman's hand. In an action for damages against the railroad company,
the plaintiff said he did not know whether the train started suddenly or not; a
witness for the plaintiff testified that starting with a jerk is something that will
happen on any freight train, and that he could not swear whether it was a usual
or an unusual jerk, and the engineer testified that "he did not start with any
unusual jerk, that he did nothing out of the ordinary in the way of starting
the train"; and there was no affirmative evidence tending to show that the
tank, which was filled with oil, would not slip a little when the car was started
with no greater jerk than that which would come from putting on a little steam
in the ordinary way. *Held,* that the court should have ruled, as requested by
the defendant, that there was no evidence "that the plaintiff was injured by
reason of the negligence of the engineer in failing to stop, start, manage, or
control the train in a proper manner."

TORT, for personal injuries occasioned to the plaintiff while
in the defendant's employ as a freight brakeman, on June 8,
1890. The declaration contained two counts, one at common

law, and the other under the employers' liability act. The answer was a general denial.

At the trial in the Superior Court, before *Bond*, J., it appeared that the plaintiff had worked as a brakeman for the defendant off and on for two years; that his train arrived at Cottage Farm from Worcester at about one o'clock on the morning of June 8th; that it consisted of thirty-five or forty cars, five or six of which were oil-tank cars; that about ten or twelve cars were to be separated from the train at Cottage Farm and left; that the place where the pin was to be pulled to separate the train was between a Boston and Albany flat car with an oil tank on it, and a box car; that the tank car was ahead of the other and would be the rear car of the twenty or, twenty-three cars attached to the engine after the pin was pulled; and that while the train was approaching Cottage Farm, before it stopped, the plaintiff tried to pull the pin between these cars.

The evidence as to the rate of speed at which the train was then moving was conflicting, the plaintiff putting it at about fifteen miles an hour when he first tried to get the pin, and at seven or eight when he finally pulled it; while Whitney, a brakeman called by the plaintiff, who was on the same car with him, said that when the pin was pulled the train was almost at a standstill.

The plaintiff got on his knees at the end of the tank car, between the tank and the end of the platform, being a space about thirty-four inches wide, and at about the middle of the car, and reached over with his right hand to get the pin, putting his left up to the block of wood at the end of the tank to feel for a grab-iron. Finding no grab-iron, he put his hand over the block, so as to save himself when the engineer started ahead. There was no brake on that end of the car. The slack of the shacklings was out and the bunters of the cars were wide apart, and the plaintiff could not pull the pin because it was held by the strain of the train, the brake on the rear of the train being set. The plaintiff called to have the engineer start the engine back against the train. The engineer did so and the plaintiff pulled the pin and called, "All right," and the motion was given by Whitney to the engineer to pull ahead. He did so, and the oil tank shifted and caught the plaintiff's hand.

The plaintiff said that he did not know whether the train started up suddenly or not, at the time the tank caught his hand. Whitney, on being asked whether the train at this time started easily or with a jerk, said that starting with a jerk is something that will happen on any freight train; that there is a good deal of slack in a given number of freight cars, and it is very hard to start the same as you start a passenger train; that it did start with a jerk; that when the engine is pushing back against the cars, and the slack is out, there is always a succession of jerks between all the cars as the engine starts up, and it cannot be otherwise; that he could not swear whether it was a usual or unusual jerk; that there was considerable slack to a certain number of cars, and a considerable jerk; and that some of the Boston and Albany tank cars he had seen had handles on the ends and some had not. Sibley, the engineer, called by the defendant, said that he started the engine at this time by letting the brake off and giving it a little steam; that he did not start with any unusual jerk; and that he did nothing out of the ordinary in the way of starting the train.

The plaintiff said that he had not noticed the block of wood before the moment he went to pull the pin; that he knew at Worcester that he was to pull the pin between these cars at Cottage Farm; that he had never seen any of these tank cars when the tank was not close up to the end block so a man could not get his hand in; that there was room between this tank and block for his hand, so that the back of his hand did not touch anything; that he knew there was oil in the tank, as he heard it splashing back and forth, and that the car was loaded with oil, as he had noticed the way-bill. He said he was familiar with the duties of brakeman; that he had never in his whole experience taken hold of the block on an oil-tank car before; that his fingers were down on the inside of the block, towards the tank, so that he could hold on; that as soon as he got the pin he was supposed to give the notice to go ahead, but not if he was in a dangerous position; that there was nothing else on the rear of this car to get hold of but the block; that he had worked with this engineer before, and had known him to throw a train so as to throw men off their feet. Whitney examined this oil tank car later on the same morning, and found that the blocking was an

inch and a half or two inches away from the tank. He said that there would be no danger of any one's falling off the flat car when the draw-bar heads were held close together by the engine shutting back against the train, and no danger until the car was started ahead by the engine, and that the engine would not start until the man who pulled the pin called, " All right." He further testified, that, on his examination of the blocking later in the morning, the blocks appeared to him out of place, but he would not swear that it was not the shrinkage of the blocking that caused the gap; that a man could tell that the block and tank were separated if he put his hand in between; and that it looked as though the blocking had worked away from the end of the tank. He said that every oil tank car had a brake on one end and none on the other, and that is true of all flat cars; that his usual way of pulling the pin on a flat car is to lie lengthwise on it on his belly.

One Adams, master car-builder on the Boston and Albany Railroad, called by the defendant, testified that the tank is kept from sliding endwise by the blocks at the end, which are about ten inches square, and cut to fit the shape of the end of the tank; that the block is bolted down, and also secured by horizontal bolts or straps, secured to timbers near the centre of the car; that the tank is also held in place by other blocks and by iron straps; that the tank weighs about eight tons when empty, contains about four thousand gallons of oil, which weighs between seven and eight pounds a gallon; that on the end on which there is no brake the distance from the tank to the end of the car is about twenty-two inches, and from the head of the draw-bar to the end of the car about twelve inches; that when the car was originally constructed the blocking was held tight as it could be to the end of the tank, drawn up by the straps or bolts; that from the shrinkage of the timbers when green wood is used, and from use, the tank always works a little way from the blocks; that when the cars come to us for any repairs we always find that the tank is a little way from the blocking; that there have never been any handles put on these blocks, or anywhere on the car; and that there is no provision made for a man to hold on upon these cars, nor upon flat cars in general.

At the close, the plaintiff waived all claim upon the evidence of any neglect of the superintendent.

The defendant asked the judge to rule as follows : " 1. That upon the whole evidence, the plaintiff cannot recover.  2. That there was no legal obligation upon the defendant to furnish handles for the plaintiff to take hold of when engaged in uncoupling the cars.  3. That there is no evidence upon which the jury can find that the plaintiff was injured by reason of the negligence of the engineer, in failing to stop, start, manage, or control the train in a proper manner.  4. That there is no evidence upon which the jury can find that the tank car was in any way defective."

The judge refused so to rule, but left the case to the jury, instructing them that the only allegations of neglect on the part of the defendant left to them to consider were the allegations, " 1. That there was a defect in the construction of this oil tank car, and 2. That the locomotive engineer was negligent in the starting, stopping, or management of the train."

The jury returned a verdict for the plaintiff ; and the defendant alleged exceptions.

*S. Hoar*, for the defendant.

*C. G. Fall*, for the plaintiff.

KNOWLTON, J.   We are of opinion that the question whether the plaintiff was in the exercise of due care was rightly submitted to the jury.   If he had reflected carefully, he might have known that the tank would be likely to slip a little on the car when the train started up with a jerk, but he testified that he had never before seen a car with a space between the tank and the block which was designed to keep the tank in place, and it is not very strange, when he reached back with his hand " to feel if there was a grab-iron there," that he took hold of the block and exposed his fingers to danger without thinking of the consequences.

The defendant asked the court to rule that there was no evidence " that the plaintiff was injured by reason of the negligence of the engineer, in failing to stop, start, manage, or control the train in a proper manner."   It is not contended in behalf of the plaintiff that the engineer was guilty of negligence in any other particular than in starting the train suddenly with a jerk.   Three witnesses were called on this point: the plaintiff, Whitney, and Sibley, the engineer.   The plaintiff said he did not know whether

the train started suddenly or not.   Whitney " said that starting with a jerk is something that will happen on any freight train ; that there is a good deal of slack in a given number of freight cars, and it is very hard to start the same as you start a passenger train ; that it did start with a jerk ; that when the engine is pushing back against the cars, and the slack is out, there is always a succession of jerks between all the cars as the engine starts up, and it cannot be otherwise ; that he could not swear whether it was a usual or unusual jerk ; that there was considerable slack to a certain number of cars, and a considerable jerk."   It was an undisputed fact that there were more than twenty cars between the engine and the car on which the plaintiff was, and that at the plaintiff's request the engineer had previously started the engine back against the train, so as to relieve the strain on the pin which the plaintiff was about to pull, and so had brought the cars together at the bunters between the engine and the car on which the plaintiff was.   The engineer testified " that he started the engine at this time by letting the brake off and giving it a little steam ; that he did not start with any unusual jerk ; that he did nothing out of the ordinary in the way of starting the train."   Plainly in this testimony there is no evidence that the engineer was negligent.   On the contrary, it tends to show that he was careful.

The only other evidence on which the plaintiff relies is the fact that when the car started the tank slipped a little on the floor of the car and caught the plaintiff's fingers.   The bill of exceptions states all the evidence material upon the question of liability.   There is no affirmative evidence tending to show that this heavy metallic cylindrical tank, filled with oil, would not slip a little on the floor of the car when the car was started with no greater jerk than that which would come from putting on a little steam in the ordinary way, if twenty-three cars had previously been crowded together so as to make considerable slack. The burden was upon the plaintiff on this point, and the only evidence bearing on it was the negative fact, in favor of the defendant, that the tank slipped in the other direction from the coming together of the cars afterwards when Whitney coupled them.   It is undisputed that there was a jerk in starting this car, and that there naturally would be a jerk in starting a car

attached as this was to so long a train in such a condition. The slipping of a tank which had little or nothing to prevent its movement in that direction until it encountered the block was evidence that force was applied suddenly to the car. But it affords no ground for anything more than conjecture that the jerk was unusual, or that the engineer started the train in an improper way. Indeed, the more natural conjecture is that he did not. There was no reason why he should not have started as usual. We can find nothing in the bill of exceptions which tends to show that the engineer was in fault, and on this point the court should have ruled as requested.

We cannot say, as matter of law, that "there was no legal obligation upon the defendant to furnish handles for the plaintiff to take hold of when engaged in uncoupling the cars," or that there was no evidence upon which the jury could find that the tank car was in any way defective. There was evidence tending to show that a handle would be convenient and useful for a brakeman to take hold of when drawing the pin, and that some of the defendant's tank cars were provided with such handles. Whether the want of one rendered this car defective was a question of fact for the jury. It did not appear what knowledge the plaintiff had in regard to the construction of the defendant's cars in this particular when he entered its service, nor what proportion of the cars have such handles and what have not, nor whether the risk of injury from the use of cars not provided with handles was or was not an obvious risk of the business, if it would be open to the defendant, under the St. of 1887, c. 270, to show that the plaintiff impliedly contracted when he entered the service that the defendant might continue to use the same kind of cars that it was then using without claim by him on that account. Whether that defence would be open, we do not deem it necessary in this case to decide.

Nor does it appear that the plaintiff had such knowledge of the defect before the accident that he was bound to give notice of it to the defendant beforehand, as a condition precedent to his recovery for an injury.

Because of the error in regard to the alleged negligence of the engineer, the entry must be,

*Exceptions sustained.*